Filed 10/30/13  In re Z.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Z.A., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E057737 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120288) |
| v. | OPINION |
| V.S. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Matthew C. Perantoni, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part; reversed in part with directions.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant mother.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant father.

Pamela J. Walls, County Counsel, and Carole A. Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

One-year-old Z.A. came to the attention of the Riverside County Department of Social Services (DPSS) when V.S., the mother, left her in the care of inappropriate caretakers who smoked marijuana in the child's presence, and father was in prison. Mother, who was herself adopted, claimed membership in a Wisconsin Oneida tribe, "Stackbridge," so notices were sent to various Oneida tribes in Wisconsin pursuant to the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). DPSS could not find a "Stackbridge" tribe, and responses from other tribes indicated the minor was ineligible for membership so the court found ICWA did not apply. After reunification services were terminated, father was released from prison, he began monthly visits, worked two jobs, and took a parenting class. He filed a petition to modify the order setting a hearing pursuant to Welfare and Institutions Code[1] section 388, but it was denied, and the court terminated parental rights. Both parents appealed.

On appeal, mother argues the court and DPSS violated the continuing duty of inquiry under ICWA, and father argues the court erred in denying his section 388 petition. We affirm the denial of father's 388 petition, but conditionally reverse the judgment terminating parental rights and direct DPSS to contact the maternal biological grandmother to obtain biographical information and provide proper notice to the Stockbridge-Munsee tribe, or other appropriate tribes.

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

## BACKGROUND

On August 27, 2010, police responded to a residence after the minor's paternal grandmother reported concern for the safety of the minor, who was one year old. The paternal grandmother had observed mother with bruises all over her body the previous day and was concerned that mother engaged in prostitution. Mother reported she had been violently beaten by a jealous woman who accused mother of sleeping with the woman's boyfriend. The police conducted a welfare check. When they arrived at the residence, they found two men in the living room, one of whom was smoking marijuana in the minor's presence, while mother slept in the bedroom. Alcohol and marijuana joints were found within reach of the minor, and roach poison was sprinkled on the floor along the baseboards, within reach of the minor. Mother was arrested for child endangerment and the minor placed in temporary foster care.

Mother informed the social worker that she had been adopted herself as a child, through the child welfare system in Wisconsin, after she had been sexually abused. Mother also informed the social worker that her biological mother, K.S.W., was a Native American. Mother also indicated that she was a member of an Oneida Stackbridge tribe, but that her membership card was stolen by the people who assaulted her on August 26, 2010. On the date of the detention hearing, mother completed a "Parental Notification of Indian Status", Judicial Council form ICWA-020, indicating she was a member, or eligible for membership in the Oneida Tribe, Stackbridge Tribe, or Ojibwa Tribe of Wisconsin. The social worker sent notices to all of the tribes except the "Stackbridge" tribe, which the social worker was informed did not exist.

3

The dependency petition alleged mother neglected the minor by failing to supervise or protect the child, leaving the child in the care of persons who used marijuana in the child's presence, and failing to provide necessities for the child, including medical treatment.[2] It was further alleged that father was serving a prison sentence and failed to make provision for the minor's support. On October 14, 2010, the court made a true finding on the petition, sustaining the petition under section 300, subdivisions (b) and (g), adjudging the minor to be a dependent. The minor was removed from the custody of the parents and was placed in foster care. The court ordered the parents to participate in reunification services.

Based on the limited information provided, none of the notified tribes found mother or the minor to be a member or eligible for tribal membership. DPSS requested a finding that ICWA did not apply in its six-month review report. By the time of the six-month review hearing, mother had enrolled in and completed parenting classes and was participating in counseling through the Indian Child and Family Services. The report indicated mother was living with A.S., her boyfriend of four months in an apartment, while Z.A.'s father remained incarcerated.

The social worker observed mother had made moderate progress, but she had not mitigated the issue that led to her child's removal, her association with adults who could

---

[2] The petition also alleged that mother was unable to provide for her child due to drug use and that she engaged in domestic disputes with other adults in the child's presence. However, mother tested negative for all substances on multiple occasions. Further, mother did not willfully engage in the assault committed upon her. For those reasons, those allegations were dismissed.

place the child's safety at risk. Because mother was participating regularly, DPSS recommended additional time for reunification services. At the status review hearing, the court continued the dependency, found mother had made adequate but incomplete progress in her reunification plan, and authorized unsupervised visits between mother and child. The court terminated father's reunification services because there was no substantial probability the child could be returned to him if given additional services. The court also found that ICWA did not apply.

At the beginning of the next reporting period, mother maintained a transient lifestyle. Although the court had authorized unsupervised visits, DPSS continued to supervise because mother brought unauthorized people to visits, and had engaged in conflicts with such persons in the presence of the child and the caregiver. Nevertheless, the visits were regular and mother interacted with the minor appropriately, overall. Mother participated in her case plan, completed parenting classes and participated in counseling, although her counseling attendance became spotty due to pregnancy with her second child. Mother obtained suitable housing and married the father of her second child. She visited Z.A. regularly and demonstrated improved parenting skills. However, on September 13, 2011, mother and her boyfriend, A.S., had words during a visit, and A.S. told mother he would "slap [the unborn] baby right out of [her]." A.S. dismissed the incident as joking around.

The new baby, N.S., was born on September 18, 2011. There were no apparent safety concerns, so DPSS did not intervene or remove the infant from mother's custody. The social worker conducted a home evaluation on September 20, 2011, and found the

5

housing to be appropriate. At that time, mother and A.S. resided with A.S.'s parents. Because mother had suitable housing, DPSS recommended return of Z.A. to mother's custody. At the hearing conducted on October 25, 2011, the court reiterated that ICWA did not apply. The court found mother's progress to be adequate but incomplete, and ordered that the prior visitation order, authorizing unsupervised overnight and weekend visits, would remain in effect.

During the next reporting period, things started out well. Mother became pregnant with her third child. The residence that the couple shared with the paternal grandparents of N.S. met acceptable health and safety standards. Mother and A.S. had adequate income from A.S.'s disability which he received for a permanent disability he sustained while serving in the Marine Corps during the Iraq conflict, where he was injured.

Mother had unsupervised six-hour visits commencing January 18, 2012, and the visits went well until the weekend of February 2012. On that occasion, mother and A.S. argued over A.S.'s infidelity, during which argument A.S. shoved mother. Subsequently, A.S. moved out of the residence, although mother continued to live with his parents. DPSS instructed mother to obtain a restraining order, and informed her that unsupervised visitation could not commence until she did so. Notwithstanding the incident, DPSS felt that out-of-home placement might no longer be necessary because mother maintained stable housing and a source of support to accommodate her family.

Before the 18-month review hearing was conducted, DPSS submitted an addendum report, raising concerns about mother's progress. Although mother had obtained a restraining order against A.S. on March 5, 2012, she never served it on him.

6

Further, she minimized the domestic violence incident that occurred in February 2012, and only sporadically participated in counseling. More disturbing to the social worker was mother's dishonesty about participating in more counseling sessions than she actually had attended. The social worker questioned whether mother had benefitted from services. DPSS therefore recommended terminating services and setting a section 366.26 hearing.

On April 2, 2012, the court followed the recommendations. It found that the extent of mother's progress was minimal, terminated services, and set a section 366.26 hearing. In June, 2012, father was released from prison but he did not contact DPSS to arrange a visit until August 17, 2012. On July 13, 2012, the social worker reported that the child's caretakers would no longer be able to pursue adoption due to changes in their circumstances and financial hardship.

Father's monthly visits commenced in September 2012. He visited once on September 7, 2012, and a second time on October 12, 2012. On October 25, 2012, father provided information to DPSS about his current stable residence, his employment, and his participation in a parenting class. Mother visited the minor on November 29, 2012, after not having visited the minor since July 2012.

An adoptive family was identified and the minor was placed in that home on September 30, 2012, after a series of successful transitional visits. The assessment of the prospective adoptive parents was positive, indicating the family was a good match for the minor. The social worker reported that the minor was thriving in the placement and developing a strong bond with the caretakers.

7

On December 12, 2012, father filed a section 388 petition seeking a modification of the prior order. His petition asserted he had obtained suitable housing, stable employment at two jobs while providing attendant care for his mother, completed a parenting class, and had visited the minor. He also asserted that granting the petition would be in the minor's best interests because he had maintained contact with the minor, brought snacks and treats to visits, and his bond with the minor would be strengthened.

On the date of the section 366.26 hearing, mother also filed a section 388 petition. The court heard the parents' 388 petitions prior to conducting the section 366.26. After considering the parents' testimony and the reports submitted by DPSS, the court denied both petitions. The court then terminated parental rights. Both parents appealed.[3]

## DISCUSSION

### 1.    Whether the Court and/or DPSS Failed to Conduct Proper and Continuing Inquiry Under ICWA.

Mother argues that DPSS and the court breached their continuing duties of inquiry under ICWA. She attached declarations to her opening brief which we do not consider because our review is limited to matters presented to the trial court which are reflected in the record. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Nevertheless, based on information in the record, we agree that DPSS failed to conduct an adequate investigation

---

[3] The record includes only mother's notice of appeal, because father's notice of appeal was filed after the record on appeal had been certified to this court, on January 17, 2012, still within the statutory time limits.

8

into the "Stackbridge" Oneida tribe which infected the court's finding that ICWA did not apply.

The ICWA was enacted to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. (*In re C.Y.* (2012) 208 Cal.App.4th 34, 39; *In re Levi U.* (2000) 78 Cal.App.4th 191, 195.) In state court proceedings involving the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe have the right to intervene at any point in the proceeding. (25 U.S.C. § 1911(c).) Thus, in any involuntary proceeding in a state court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child must notify the parent or Indian custodian and the Indian child's tribe of the pending proceedings. (25 U.S.C. § 1912(a).)

A social worker has an affirmative and continuing duty to inquire whether a child in a section 300 proceeding is or may be an Indian child. (§ 224.3, subd. (a).) If a social worker has reason to know that an Indian child is involved, the social worker is required to make further inquiry regarding the possible Indian status of the child. (§ 224.3, subd. (c).) There are many instances in which vague or ambiguous information is provided regarding Indian heritage or association; in these types of cases, inquiry is necessary before any attempt at notice to a specific tribe can be made. (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1200.) However, neither the court nor DPSS is required to conduct a

9

comprehensive investigation into the minor's Indian status. (*In re C.Y, supra,* 208 Cal.App.4th at p. 39; *In re S.B.* (2005) 130 Cal.App.4th 1148, 1161.)

ICWA defines an Indian child as an unmarried person under the age of 18 who is: (1) a member of an Indian tribe; or (2) eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).) A child may qualify as an Indian child within the meaning of ICWA even if neither of the child's parents is enrolled in the tribe. (*In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1166.) The determination of the child's Indian status is up to the tribe, so the juvenile court needs only a suggestion of Indian ancestry to trigger the notice requirement. (*In re Nikki R.* (2003) 106 Cal.App.4th 844, 848.)

Here, DPSS was informed at the earliest point in the proceedings that the biological grandmother was an enrolled member of a tribe and that mother, herself, was an enrolled member of an Indian tribe. DPSS was therefore aware that an Indian child might be the subject of the involuntary custody proceeding. The problem arose when mother completed the ICWA 020 form, in which she listed the possible tribe to which she belonged as the "Stackbridge" tribe. Without conducting any inquiry on her own, the social worker accepted information from an unnamed noticing clerk indicating that the "Stackbridge" tribe did not exist, and did not send any notice to that tribe.

Without difficulty, we found the tribe. The Department of Interior's list of "Indian Entities Recognized and Eligible to Receive Services From the Bureau of Indian Affairs" (otherwise known as the list of Federally Recognized Tribes) includes the "Stockbridge Munsee Community, Wisconsin." (77 Fed.Reg. 47868, 47871 [No. 155, 2012].) The

10

Stockbridge-Munsee Community of Wisconsin reveals that the tribe descended from a group of Mohican Indians who joined the Oneida Indians in New York in 1785, and, together, both tribes were relocated to Wisconsin. (Stockbridge-Munsee Band of Mohican Indians, http://witribes.wi.gov/docview.asp?docid=19080&locid=57 [as of Aug. 31, 2013], p. 2.)

DPSS did not properly discharge its inquiry duty and did not send any notices whatsoever to the Stockbridge tribe, despite knowing that mother was an enrolled tribal member who obtained reunification services from the Indian Child and Family Services. Denying the existence of the child's tribe does not promote the child's best interests because it denies the child an important cultural link. This child was eligible for tribal membership and the tribe was entitled to notice of the involuntary custody proceedings. The finding that ICWA does not apply was erroneous due to the failure of the social worker to inquire further into mother's tribal affiliation whether through communication with the Wisconsin child welfare agency, which handled mother's own dependency and adoption proceedings, or by checking the relevant tribal registry.

A limited remand with directions to provide notice to the appropriate Indian tribe will therefore be ordered.

## 2.     *The Court Did Not Abuse Its Discretion in Denying Father's 388 Petition.*

Father argues that the juvenile court abused its discretion in denying his section 388 petition. We disagree.

A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or

11

changed circumstances exist, and (2) the proposed change would promote the best interests of the child. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 316-317.) The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child. (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529 (*Kimberly F*.).) Generally, the petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)

In evaluating whether the petitioner has met his or her burden to show changed circumstances, the trial court should consider: (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. (*Kimberly F., supra,* 56 Cal.App.4th at p. 532.)

The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion. (*In re Stephanie M., supra,* 7 Cal.4th at p. 318; *In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

Father's changed circumstances related to suitable housing, working two part-time jobs as well as working for In-Home Support Services caring for his mother, completing a parenting class and visiting the minor. He alleged the requested modification would serve the minor's best interests because he brought snacks and treats to visits and return of custody or resumption of services would strengthen the bond. At the hearing on his

12

petition, father testified that he also participated in a counseling program, although he previously had informed the social worker that he was participating in premarital counseling through his church.

We will acknowledge that father's release from custody was a change of circumstances, given that his incarceration was the sole allegation against him in the dependency petition. We also acknowledge that in the five months after his release, father made important milestones by obtaining employment and completing a parenting class.

But we cannot find that modification of the prior order would serve the child's best interest where father was absent for most of the first three years of the minor's life, during which time he made no attempt to communicate with the minor or inquire about her well-being. He was released from custody on June 30, 2012, but did not contact the social worker until August 2012, and only started having monthly visits with the minor in September 2012, three months before the section 366.26 hearing. He had visited her a mere two or three times upon his release.[4] While father testified that there was a bond between the minor and himself, the record does not support this assertion. The social worker's report of the visits revealed that the minor was guarded and did not interact with father, although he was appropriate with her.

---

[4] The social worker's addendum report prepared for the section 366.26 hearing indicated father had visited twice by the date the report was prepared, but we are unaware whether any additional visits took place before the hearing.

13

There was no significant bond which would justify resumption of reunification services. Further, bringing snacks and treats to visits does not demonstrate that modification is in the child's best interests. Even if the father's circumstances were changed, the juvenile court did not abuse its discretion in denying the section 388 petition.

## DISPOSITION

The judgment is reversed for the limited purpose of complying with ICWA notice requirements. On remand, DPSS is directed to (1) obtain all information available about mother's Indian ancestry, from mother, the biological maternal grandmother, and the Wisconsin child welfare agency, and (2) to provide notice to the appropriate tribes, including but not limited to the Stockbridge-Munsee Community of Wisconsin. If, after receiving proper notice, an Indian tribe intervenes, the juvenile court shall proceed in accordance with ICWA. If no Indian tribes intervene after receiving proper notice, the judgment shall be reinstated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

RICHLI
J.

14